121 P.3d 843

**ARIZONA MINORITY COALITION FOR FAIR REDISTRICTING; State Senator Ramon Valadez; State Senator Peter Rios; State Senator Carlos Avelar; State Senator James Sedillo; Maricopa County Supervisor Mary Rose Garrido Wilcox; Esther Lumm; Virginia Rivera; Los Abogados, an Arizona corporation, Plaintiffs–Appellees,**

**City of Flagstaff, Intervenor Plaintiff–Appellee,**

v.

**THE ARIZONA INDEPENDENT REDISTRICTING COMMISSION; Steven W. Lynn, in his official capacity as Chairman and a Commissioner thereof; Andrea Minkoff, in her official capacity as Vice Chairman and a Commissioner thereof; Daniel R. Elder, in his official** capacity as a Commissioner thereof; Joshua M. Hall, in his official capacity as a Commissioner thereof; James R. Huntwork, in his official capacity as a Commissioner thereof, Defendants–Appellants,

and

**Arizonans for Fair and Legal Redistricting, an Arizona non-profit corporation; Dr. Jose Burell; Francis Ann Burell; Ephram Cordova; Craig Echeveste; Armando Gaypan; Jesse Hernandez; Gina Marcela; Al Pena; Al Rodriguez; Raul B. Romero; Raul R. Romero, Sr.; Martin Sepulveda; Ilia Terrazas; City of Kingman; Mohave County; Lake Havasu City, Intervenors–Appellants,**

**The Navajo Nation; Leonard Gorman, Intervenors–Appellants,**

v.

**Arizona Independent Redistricting Commission, a state agency; Janice K. Brewer, in her official capacity as Arizona Secretary of State, Defendants–Appellees,**

and

**The Hopi Tribe, Arizonans for Fair and Legal Redistricting, Inc., an Arizona non-profit corporation; Dr. Jose Burell; Francis Ann Burell; Ephram Cordova; Craig Echeveste; Armando Gaypan; Jesse Hernandez; Gina Marcela; Al Pena; Al Rodriguez; Raul B. Romero; Raul R. Romero, Sr.; Martin Sepulveda; Ilia Terrazas, Intervenors–Appellees.**

No. 1 CA–CV 04–0061.

Court of Appeals of Arizona. Division 1, Department C.

Oct. 21, 2005.

Review Denied Jan. 4, 2006.

Gammage & Burnham, P.L.C., By Lisa T. Hauser, Cameron C. Artigue, Leonard W. Aragon, Phoenix, for Arizona Independent Redistricting Commission and Commissioners.

Haralson Miller Pitt Feldman & McAnally, PLC, By Jose de Jesus Rivera, Peter T. Limperis, Jane E. Reidel, Amy Hernandez, Phoenix, for Arizona Independent Redistricting Commission and Commissioners.

Gallagher & Kennedy, P.A., By Mark C. Dangerfield, Phoenix, for Arizonans for Fair & Legal Redistricting.

Jones, Day, Reavis & Pogue, By Michael A. Carvin, Admitted pro hac vice, Washington, DC, for Arizonans for Fair & Legal Redistricting.

Perkins Coie Brown & Bain, By Paul F. Eckstein, Michael S. Mandell, Suzanne R. Scheiner Marwil, Charles A. Blanchard, Phoenix, for Arizona Minority Coalition for Fair Redistricting, et al.

Lewis and Roca, LLP, By Richard A. Halloran, Susan E. Anderson, Susan M. Freeman, Phoenix, for Arizona Minority Coalition for Fair Redistricting, et al.

Law Offices of Aaron Kizer, PLC, By Aaron Kizer, Phoenix, Co–Counsel for Arizona Minority Coalition for Fair Redistricting.

Sacks Tierney, By Marvin S. Cohen, Judith M. Dworkin, Patricia Ferguson–Bohnee, Scottsdale, for The Navajo Nation and Leonard Gorman.

Navajo Nation, Department of Justice, By Dana L. Bobroff, Assistant Attorney General, Window Rock, for The Navajo Nation and Leonard Gorman.

Terry Goddard, Arizona Attorney General, By Mary R. O'Grady, Solicitor General, Assistant Attorney General, Jessica Gifford Funkhouser, Assistant Attorney General, Phoenix, for Arizona Secretary of State.

Jennings Strouss & Salmon, PLC, By David B. Earl, David J. Cantelme, Phoenix, for City of Flagstaff.

Robert A. Taylor, Kingman City Attorney, Kingman, for City of Kingman.

Lake Havasu City Attorney's Office, By W. Kent Foree, Lake Havasu City, for Lake Havasu City.

Matthew J. Smith, Mohave County Attorney, By Jeffrey D. Dollins, Deputy County Attorney, Deborah L. Herbert, Deputy County Attorney, Kingman, for Mohave County.

Roush McCracken Guerrero & Miller, By Daniel R. Ortega, Jr., Phoenix, for Hopi Tribe.

## AMENDED OPINION

PER CURIAM.

¶ 1 In November 2000, Arizona voters approved Proposition 106, which amended the Arizona Constitution and transferred the power to redraw lines for both legislative and congressional districts from the state legislature to the Arizona Independent Redistricting Commission ("Commission"). *Ariz. Indep. Redistricting Comm'n v. Fields*, 206 Ariz. 130, 134, ¶ 4, 75 P.3d 1088, 1092 (App. 2003); Ariz. Const. art. 4, pt. 2, § 1. In this appeal, we must decide whether the trial court correctly ruled on constitutional challenges to districts established by the Commission for use in elections held from 2004 through 2010. For the reasons that follow, we affirm in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this Opinion.

## BACKGROUND

¶ 2 The Commission consists of five appointed volunteers who serve concurrent ten-year terms. Ariz. Const. art. 4, pt. 2, §§ 1(3), (23). Commission members represent both major political parties; however, the chairperson must not be a registered member of either party. Ariz. Const. art. 4, pt. 2, § 1.[1]

---

1. The highest ranking officer of the state House of Representatives, the House minority party

¶ 3 Pursuant to the redistricting provisions created by the passage of Proposition 106, the redistricting process begins with the creation of districts with equal population in a grid-like pattern across the state. Thereafter, the Commission is required to make adjustments to the grid, "as necessary," to accommodate various goals, including compliance with the Voting Rights Act, 42 U.S.C. § 1973c (1994) ("VRA") and respecting geographic, community, and competitive interests. Ariz. Const. art. 4, pt. 2, § 1(14).[2]

¶ 4 The Commission must exclude party registration and voting history data from the initial phase of the mapping process but may use such information to test maps for compliance with the above-listed goals. *Id.* at § 1(15). "The places of residence of incumbents or candidates shall not be identified or considered." *Id.* Additionally, the Commission is required to advertise a draft map for comment by the public and for recommendations by the legislature. *Id.* at § 1(16). The recommendations "shall be considered" in establishing the final boundaries. *Id.*

¶ 5 The Commission hired National Demographics Corporation ("NDC") to consult on the commencement of the mapping process. Thereafter, on June 7, 2001, the Commission adopted its grid map, based solely on formulating districts of equal population, and then held the first round of hearings for the public to review and comment on the grid. The Commission next considered the other criteria required by Article 4, Part 2, Section 1(14) of the constitution in order to modify the grid map and create a draft map, which the Commission adopted on August 17.[3] The Commission then presented its draft map and invited comments during a second round of public hearings.

¶ 6 On November 9, the Commission certified the 2001 legislative and congressional plans to the Arizona secretary of state, who certified the plans for the 2002 elections. In compliance with Section 5 of the VRA,[4] the plans were then submitted to the United States Department of Justice ("DOJ") for preclearance.[5]

¶ 7 On March 6, 2002, the Arizona Minority Coalition for Fair Redistricting, several

---

leader, the highest ranking officer of the state Senate, and the Senate minority party leader each are allowed to appoint a commission member from a pool of candidates selected by the Commission on Appellate Court Appointments. Ariz. Const. art. 4, pt. 2, § 1(6). The four members then select the fifth member and chair of the Commission, who must not be registered with any party represented on the Commission. *Id.* at § 1(8).

2. The constitutionally mandated goals are:
A. Districts shall comply with the United States [C]onstitution and the [U]nited [S]tates [V]oting [R]ights [A]ct;
B. Congressional districts shall have equal population to the extent practicable, and state legislative districts shall have equal population to the extent practicable;
C. Districts shall be geographically compact and contiguous to the extent practicable;
D. District boundaries shall respect communities of interest to the extent practicable;
E. To the extent practicable, district lines shall use visible geographic features, city, town and county boundaries, and undivided census tracts;
F. To the extent practicable, competitive districts should be favored where to do so would create no significant detriment to the other goals.
Ariz. Const. art. 4, pt. 2, § 1(14).

3. The parties dispute when, if at all, the Commission first considered the criterion of competitive districts.

4. *See Fields*, 206 Ariz. at 134, ¶ 3, 75 P.3d at 1092 (explaining that because of past violations of the VRA, Arizona must submit redistricting plans for preclearance to either the United States Department of Justice or the District Court for the District of Columbia).

5. The DOJ precleared the congressional plan, but denied preclearance of the legislative plan on March 26, 2002, requiring increased effective Hispanic voting strength in at least three legislative districts. *See Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F.Supp.2d 998, 1003 (D.Ariz.2002). The Commission then filed suit in federal court in May 2002 seeking approval of an emergency legislative interim plan for the 2002 elections. *Id.* The Commission reconfigured the three affected districts, and the district court approved the interim plan for the 2002 elections. *Id.* at 1016. The Commission continued to work on a plan for use in 2004—2010 and, on August 14, 2002, adopted a final legislative redistricting plan. In February 2003, DOJ precleared this plan. The plaintiffs contesting the legislative plan in this case amended their complaints to challenge the 2002 final legislative redistricting plan.

state legislators, and others (collectively, the "Coalition") filed suit in superior court against the Commission challenging the legislative plan. The Coalition asserted that the Commission had failed to comply with Article 4, Part 2, Section 1(14)(F) by foregoing the creation of competitive districts when "it was possible to do so." The complaint alleged that, in violation of the voters' mandate, the Commission's proposed map would result in fewer, rather than more, competitive legislative districts. The Coalition contended that its own alternative plan accomplished all of the Section 1(14) goals better than the Commission's plan. The Coalition sought a writ of mandamus and declaratory or injunctive relief.

¶ 8 On March 14, 2002, a separate action challenging the congressional plan was filed, alleging the Commission violated Article 4, Part 2, Section 1(14), Article 2, Sections 4 and 13, and Article 20, Section 7, by adopting a plan that discriminated on the basis of race. The superior court consolidated the cases on March 19, 2002. Arizonans for Fair and Legal Redistricting ("AFLR"),[6] Mohave County, the Navajo Nation, the Hopi Tribe and the cities of Lake Havasu, Flagstaff, and Kingman intervened to protect their respective interests.

¶ 9 During the course of the litigation, the Navajo Nation and the Commission stipulated to a statement of facts and filed cross-motions for summary judgment concerning the former's challenge to the congressional plan.[7] Specifically, the Navajo Nation contested the plan because it removed the Hopi Tribe, which is completely surrounded by the Navajo Nation, from congressional district 1, the district in which the Navajo Nation was placed, and put the Hopi Tribe in adjoining district 2. The Commission achieved this by using a narrow, 103-mile serpentine corridor that partially follows the Colorado River through the Grand Canyon to connect the Hopi Tribe with the rest of district 2.[8] Forty-two Navajo citizens reside within that corridor and were therefore separated from district 1. The Navajo Nation alleged that the Commission violated Article 4, Part 2, Section 1(14) by carving out a community residing within district 1 to place it within district 2. The trial court granted the Commission's motion and denied the Navajo Nation's motion, ruling that the constitution allows the Commission flexibility in applying the enumerated criteria as long as its decisions have a basis. The Navajo Nation appeals this ruling.

¶ 10 Following the completion of discovery, a trial to the court took place in late 2003 concerning the challenges to the legislative plan, and the court issued a ruling in January 2004. In detailed findings of fact and conclusions of law, the court found that the final legislative plan did not sufficiently favor competitive districts and therefore enjoined use of the plan. It also ruled that the new constitutional provisions were not "self-executing," and consequently directed the Commission to formulate various definitions and standards. The Commission, AFLR, and thirteen individual intervenors appeal this ruling. However, in compliance with the court's order, the Commission prepared a new legislative plan on April 12, 2004, which the court approved on April 16. The Commission and AFLR then amended their notices of appeal to include an appeal from the latter order.[9] The City of Kingman and Mohave County appeal the order approving the revised plan.

¶ 11 We have jurisdiction over these matters pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1) (2003) and 12–2101(B) (2003).

## STANDARD OF REVIEW

¶ 12 In reviewing the court's rulings in the legislative redistricting case, we will

---

6. AFLR is an organization formed "to advance Republican Party interests in the Arizona redistricting process."

7. The Hopi Tribe joined in the Commission's motion for summary judgment.

8. A map of the contested portion of proposed districts 1 and 2 follow this Opinion as Appendix A.

9. By decision order entered May 28, 2004, this court stayed the trial court's January 16 and April 16 orders pending the outcome of the appeal.

not set aside the trial court's findings of fact unless they are clearly erroneous. Ariz. R. Civ. P. 52(a); *Nordstrom, Inc. v. Maricopa County,* 207 Ariz. 553, 558, ¶ 18, 88 P.3d 1165, 1170 (App.2004). "A finding is clearly erroneous if no reasonable evidence supports it." *In re B.S.,* 205 Ariz. 611, 614, ¶ 5, 74 P.3d 285, 288 (App.2003). However, we are not bound by the court's conclusions of law and draw our own legal conclusions from the facts. *Ariz. Bd. of Regents v. Phoenix Newspapers, Inc.,* 167 Ariz. 254, 257, 806 P.2d 348, 351 (1991). Likewise, we are not bound by findings of fact that are induced by a mistaken view of the law. *Id.*

■ ¶ 13 We review the trial court's entry of summary judgment in the congressional redistricting case de novo. *S. Pac. Transp. Co. v. Dep't of Revenue,* 202 Ariz. 326, 329–30, ¶ 7, 44 P.3d 1006, 1009–10 (App.2002). Summary judgment is proper if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c); *Orme Sch. v. Reeves,* 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990).

■ ¶ 14 Finally, we review the court's interpretation of the constitution de novo as a question of law. *Univ. Med. Ctr. Corp. v. Dep't of Revenue,* 201 Ariz. 447, 450, ¶ 14, 36 P.3d 1217, 1220 (App.2001).

## ANALYSIS

### I. Judicial review of the Commission's redistricting plans

■ ¶ 15 The United States Supreme Court has held that redistricting is a legislative matter "which the [ ] courts should make every effort not to preempt." *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978). It has directed that courts not become "bogged down" in redistricting cases by coming up with their own alternative plans and that "such involvements [by courts] should never begin." *Gaffney v. Cummings,* 412 U.S. 735, 750–51, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). In giving such direction, the Court reiterated frequent prior admonitions that redistricting is the function of state and local governments or those enti-

ties to whom the legislature assigns the task. *Id.*

■ ¶ 16 Based on the limitations set forth by the Supreme Court, state courts have restricted their involvement in redistricting cases to determining whether proposed redistricting plans are constitutional. *See In re Senate Bill 177,* 132 Vt. 282, 318 A.2d 157, 162 (1974) (ruling that "[w]hatever this Court may believe about the wisdom of an alternative [redistricting] solution, our testing of this legislative function must be confined to its constitutional and statutory propriety"); *Hartung v. Bradbury,* 332 Or. 570, 33 P.3d 972, 980–81 (2001) (noting that the court's responsibility is to determine the redistricting plan's compliance with constitutional criteria and that "the court is not privileged to substitute its judgment about the wisdom of the plan"); *Jensen v. Ky. State Bd. of Elections,* 959 S.W.2d 771, 776 (Ky.1997) (opining that "[o]ur only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted"). As the Colorado Supreme Court stated:

> Our role in this proceeding is a narrow one: to measure the present reapportionment plan against the constitutional standards. The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court.

*In re Reapportionment of the Colo. Gen. Assembly,* 828 P.2d 185, 189 (Colo.1992) (quoting *In re Reapportionment of the Colo. Gen. Assembly,* 647 P.2d 191, 194 (Colo. 1982)).

¶ 17 Accordingly, it is not the function of the trial or appellate court to direct how the Commission should change or improve plans, or to determine which of a number of proposed plans is superior. *Id.* Such discretion is given solely to the Commission. *See Gaffney,* 412 U.S. at 751, 93 S.Ct. 2321. Instead, judicial review is necessarily confined to constitutional challenges to the selected plans. With these principles in mind, we turn to the parties' arguments.

## A. Equal Protection claims

■ ¶ 18 Before the trial court, the Coalition and others alleged that the legislative and congressional plans, as originally adopted by the Commission, violated the Equal Protection Clauses of the United States and/or Arizona Constitutions.[10] Equal protection claims are subject to one of three standards of review. *Green v. City of Tucson,* 340 F.3d 891, 896 (9th Cir.2003). The least deferential is strict scrutiny, which applies when a law "substantially burdens fundamental rights" or makes distinctions based on certain suspect classes, such as race. *Id.* An intermediate level of scrutiny applies to distinctions of quasi-suspect classes, such as gender. *Id.* All other laws are subject to a rational basis analysis, the most deferential standard of review, and "will be upheld if they are rationally related to a legitimate governmental purpose." *Id.* (citing *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)).

¶ 19 In the instant case, the trial court utilized the strict scrutiny standard in deciding the plaintiffs' constitutional challenges. The Coalition and Flagstaff contend that the trial court was correct in applying this standard. The Coalition argues that the strict scrutiny standard is required because the Commission's redistricting plans implicate the "core constitutional right to vote." Specifically, the Coalition contends that the legislative plan "packs" minority votes in legislative district 14, thus violating the VRA and diluting Hispanic voting strength.

¶ 20 The Coalition and Flagstaff also assert that the Commission created its redistricting plans without first defining constitutional terms and thereby failed to apply uniform standards, in violation of the Equal Protection Clause. Flagstaff asserts that without uniform definitions for terms such as "competitiveness" and "communities of interest," voters cannot be certain they have been treated equally. Citing *Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), it reasons that the Commission thus "performed its work in an arbitrary fashion ... with no means of assuring that it did not ... 'value one person's vote over that of another.' " Flagstaff therefore contends that the Commission is precluded from applying different standards to different voters depending on where they live.

¶ 21 The Navajo Nation also advocates for the strict scrutiny standard. It claims that the congressional plan neither creates geographically compact and contiguous districts nor utilizes undivided census tracts. It alleges that the Commission failed to use visible geographic features in establishing district lines and that it wrongly split the Navajo Nation into two districts, thus failing to respect both the Navajo Nation's community of interest and the community of interest it shares with other tribes. The Navajo Nation further claims that the plan "creates a gerrymandered district for the sole purpose of excluding the Hopi Tribe from the adopted Congressional District 1."

¶ 22 In opposition, the Commission asserts that the trial court erred when it applied the strict scrutiny standard to review the plans, arguing that the court should have utilized the more deferential rational basis standard of review. While the Commission admits that redistricting will affect *where* individuals will cast their votes, and thus relates to the fundamental, constitutional right to vote, it argues that the mere relationship between redistricting and voting does not, in the absence of any *impairment* of the right to vote, mandate strict scrutiny review. Further, the Commission contends that application of the strict scrutiny standard is inappropriate when, as here, there are no allegations of racial gerrymandering.

### 1. Has the right to vote been impaired?

■ ¶ 23 We first consider whether the Commission's plans substantially burdened a fundamental right, thereby triggering use of the strict scrutiny standard of review. All

---

10. The record does not clearly reflect whether all parties asserted equal protection violations under both constitutions. Regardless, no party disputes that the Equal Protection Clauses of each constitution have the same effect, and we agree.

*See, e.g., Valley Nat'l Bank v. Glover,* 62 Ariz. 538, 554, 159 P.2d 292, 299 (1945); *State v. Bonnewell,* 196 Ariz. 592, 596, ¶ 15, 2 P.3d 682, 686 (App.1999). We therefore confine our discussion to federal equal protection principles.

agree that the right to vote is "the protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters." *San Antonio Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). However, this does not mean that every law or constitutional provision relating to voting triggers strict scrutiny review.

¶ 24 Strict scrutiny review applies when citizens' voting rights are substantially burdened. *See Dunn v. Blumstein*, 405 U.S. 330, 336–37, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (striking down a durational residence law that denied new residents the right to vote); *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377, 404–05 (2002) (Orr, J., concurring in part and dissenting in part) (applying strict scrutiny to invalidate a redistricting plan allowing some voters to elect multiple representatives while limiting others to electing only one representative). For example, in *Charfauros v. Board of Elections*, 249 F.3d 941, 952–53 (9th Cir.2001), the Ninth Circuit applied strict scrutiny to overturn an election rule that disqualified four voters residing on a small island within the Northern Mariana Islands. The court stressed the importance of the "right to participate in elections on an equal basis," *id.* at 951 (quoting *Dunn*, 405 U.S. at 336, 92 S.Ct. 995), and noted that while the government could impose some restrictions, it could not "choose means that unnecessarily burden or restrict constitutionally protected activity." *Id.* (quoting *Dunn*, 405 U.S. at 343, 92 S.Ct. 995).

¶ 25 However, the United States Supreme Court has rejected the notion that "any burden upon the right to vote must be subject to strict scrutiny," emphasizing that "[o]ur cases do not" support that "erroneous assumption." *Burdick v. Takushi*, 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (upholding a state's ban on write-in candidates). The *Burdick* Court explained that states have the right to regulate their state elections, and it noted that "government must play an active role in structuring" those elections. *Id.* at 433, 112 S.Ct. 2059. The Court emphasized that "there must be a substantial regulation of elections if they are to be fair and honest" and promote order in our democracy. *Id.* The Court acknowledged that such regulations would necessarily impose some burdens upon voters. *Id.* It concluded, however, that "to subject every voting regulation to strict scrutiny . . . would tie the hands of [s]tates seeking to assure that elections are operated equitably and efficiently." *Id.* Thus, the level of scrutiny used to review a state election law depends on the extent of the burden imposed on voters' rights guaranteed by the First and Fourteenth Amendments to the United States Constitution. *Id.* at 434, 112 S.Ct. 2059. As such, only "severe" restrictions are subject to strict scrutiny review. *Id.* (citing *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). Accordingly, in *Burdick*, the ban on write-in voting, as part of a larger system that afforded "constitutionally sufficient ballot access, d[id] not impose an unconstitutional burden" and was not subject to strict scrutiny analysis. *Id.* at 441, 112 S.Ct. 2059; *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8, 10–11, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) (rejecting constitutional challenge to Puerto Rico's system of allowing only members of ex-representative's party to elect interim representative and noting that choice of system entitled to substantial deference).

¶ 26 The Coalition and Flagstaff rely heavily on *Mayor of Tucson v. Royal*, 20 Ariz.App. 83, 510 P.2d 394 (1973), to support their claim that redistricting affects the right to vote and therefore is subject to strict scrutiny review. In *Royal*, government officials created a redistricting plan pursuant to the city charter in order to equalize population in six voting wards. *Id.* at 83–84, 510 P.2d at 394–95. Three of the wards held primary and at-large elections in 1973, while the remaining three wards held elections in 1975. *Id.* at 84, 510 P.2d at 395. The redistricting plan dispersed voters among all wards, thereby depriving approximately 47,000 voters of the ability to vote in the 1973 primary election. *Id.* The *Royal* court concluded that "[l]aws which impair the right to vote are unconstitutional unless the governmental body can demonstrate that the laws are necessary to promote a[c]ompelling governmental interest." *Id.* at 87, 510 P.2d at

398. It upheld the trial court's decision to strike the redistricting plan because it was not necessary to promote a compelling governmental interest "in the face of the temporary disenfranchisement of [thousands of] voters" when there existed "an apparent less disruptive alternative." *Id.* at 89, 510 P.2d at 400.

¶ 27 We distinguish *Royal* from the present case. The record before us does not reflect that any citizen would be denied the right to vote under the redistricting plans. Indeed, no party has even alleged such a result. Because *Royal* involved the disenfranchisement of voters, and such disenfranchisement does not exist in this case, we are not persuaded that *Royal* supports utilization of the strict scrutiny standard.[11]

¶ 28 The common thread in redistricting cases applying strict scrutiny review is the denial of the right to vote on an equal basis with others. That element is absent in this case. The Commission's redistricting plans do not impose "severe" restrictions, *see Green,* 340 F.3d at 896, substantially burden the right to vote, *see Burdick,* 504 U.S. at 432, 112 S.Ct. 2059; *Royal,* 20 Ariz.App. at 87, 510 P.2d at 398, or treat voters unequally, *see Charfauros,* 249 F.3d at 951. Rather, they merely place residents into districts after applying the required constitutional criteria.

¶ 29 The Coalition and Flagstaff further rely on *Gore* to argue that the Commission's failure to define those terms found in Article 4, Part 2, Section 1(14) necessarily resulted in the use of disparate standards when adopting the plans and drawing the districts. They assert that this constituted arbitrary and disparate treatment of voters because it could cause one person's vote to be valued above another's, in express prohibition of *Gore. See* 531 U.S. at 104, 121 S.Ct. 525. This reliance on *Gore* is misplaced.

¶ 30 The controversy in *Gore* arose from the recounting of hole-punched presidential ballots cast in Florida in the 2000 election

that had not been properly perforated. *Id.* at 105, 121 S.Ct. 525. Specifically, some ballots had only indentations where voters apparently had attempted to indicate their selections for president, while other ballots had partially punched holes of various degrees, commonly known as "hanging chads." *Id.* Florida's respective counties, and recount teams within those counties, used their own standards to define a "legal vote," with one county even changing its standard in the middle of the recount. *Id.* at 106. Thus, similarly looking ballots were counted differently depending on where the voter lived and who was doing the counting. *Id.* The United States Supreme Court held that Florida could not apply varying standards from county to county, or from one recount team to the next within a county, to interpret voters' intentions. *Id.* at 110, 121 S.Ct. 525. It further held that such inconsistencies were arbitrary and did not treat citizens' votes equally. *Id.* at 107, 121 S.Ct. 525. The Court stated that one source of the fundamental right to vote "lies in the equal weight accorded to each vote and the equal dignity owed to each voter," and concluded that Florida could not "value one person's vote over that of another." *Id.* at 104–05, 121 S.Ct. 525.

¶ 31 Under the Commission's plans, all Arizona registered voters would be allowed to vote and each ballot would be counted equally. Although the subjective application of the mandated constitutional standards may have varied district to district in determining where to draw district lines, those boundaries did not determine whether someone would be allowed to vote or whether that vote would count. This is quite different from the impermissible arbitrary exclusion of otherwise qualified ballots at issue in *Gore. Id.* at 104–06, 121 S.Ct. 525. Here, no such arbitrary or disparate treatment has occurred. The alleged lack of uniformity in applying the criteria among the districts does not constitute the valuing of one person's

---

11. Moreover, even if we were to agree that *Royal* stands for the proposition that strict scrutiny is the required standard of review in *all* redistricting cases, such an interpretation would be contrary to more recent holdings of the United States Supreme Court. *See Burdick,* 504 U.S. at 432, 112 S.Ct. 2059; *Norman,* 502 U.S. at 289, 112 S.Ct. 698; *Rodriguez,* 457 U.S. at 8, 10–11, 102 S.Ct. 2194.

vote over another, and *Gore* does not stand for the proposition that each voter must be allowed to reside in his or her district of choice. *Gore* only guarantees that once all votes are cast, they must be treated with "equal weight." *Id.* at 104, 121 S.Ct. 525.

¶ 32 Flagstaff nevertheless asserts that redistricting "has a direct impact on the weight of each vote," presumably because grouping like-minded people theoretically makes it easier for an elected official to represent the interests of those people. However, Flagstaff cites no authority for a constitutional right to "ease of representation," and we find none.[12]

■ ¶ 33 Finally, Flagstaff argues that by approving Proposition 106, the voters "constitutionalized" the redistricting process, just as the framers enshrined the right to bring legal action for recovery of personal damages. *Kenyon v. Hammer*, 142 Ariz. 69, 83, 688 P.2d 961, 975 (1984) (employing strict scrutiny review of medical malpractice litigation procedures). Flagstaff fails to explain, however, how *Kenyon* applies to its claims or how the redistricting plans impair the right to vote. Rather, as explained previously, redistricting does not affect "the essence of the fundamental right" to vote, and strict scrutiny is thus inapplicable. *See id.* Moreover, it is well settled that the regulation of elections will necessarily place certain burdens upon voters; however, as discussed previously, such burdens are not sufficiently substantial to trigger strict scrutiny review. *See Burdick*, 504 U.S. at 432, 112 S.Ct. 2059. For all these reasons, the redistricting plans do not impermissibly or substantially burden the fundamental right to vote.

### 2. Has a suspect class been impacted?

■ ¶ 34 We next consider whether the Commission was predominantly motivated by race when it created the redistricting plans, thereby triggering strict scrutiny review.

*Abrams v. Johnson*, 521 U.S. 74, 91, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); *Miller v. Johnson*, 515 U.S. 900, 913, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (strict scrutiny applicable when the "dominant and controlling rationale" in creating districts was "race for its own sake" and "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations").

■ ¶ 35 In *Bush v. Vera*, the United States Supreme Court applied strict scrutiny review to examine claims that district lines were drawn based on race. 517 U.S. 952, 972–73, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). However, such review was only applied to those districts where "intensive and pervasive use of race" was used to maximize minority populations irrespective of traditional redistricting guidelines. *Id.* The Court pointedly confirmed its prior ruling in *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), that the threshold for applying strict scrutiny in this setting is reached only when "redistricting legislation . . . is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles." *Id.* at 958, 116 S.Ct. 1941. Strict scrutiny is not automatically triggered in every case involving the intention to create majority-minority districts or in cases where lines are drawn "with consciousness of race." *Id.* The Court reiterated that "[f]or strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were subordinated to race" and that race was "the predominant factor." *Id.* at 959, 116 S.Ct. 1941 (citing *Miller*, 515 U.S. at 916, 115 S.Ct. 2475).

¶ 36 The parties challenging the redistricting plans did not allege that race was the predominant motive of the Commission in creating the plans or that it subordinated legitimate race-neutral criteria to race.[13] *See*

---

**12.** Flagstaff further argues that voters possess the right to have their districts drawn in satisfaction of the constitutional mandates, as such compliance may affect the weight of any given vote and impact the outcome of an election. We conclude, however, that such a result does not impair the right to vote itself. Therefore, it does not trigger strict scrutiny review.

**13.** The complaints clearly allege political gerrymandering, which has been distinguished from racial gerrymandering. *See Vieth v. Jubelirer*, 541 U.S. 267, 285, 124 S.Ct. 1769, 158 L.Ed.2d

*id.* Rather, the complaints are premised on allegations that the Commission improperly applied the constitutional criteria in developing the maps, failed to fulfill its constitutional duties, and thereby violated the plaintiffs' "fundamental right to vote." However, the plans are not so "extremely irregular" that segregation for voting purposes is the only reasonable explanation. *See id.* at 958, 116 S.Ct. 1941. Accordingly, there has been no unconstitutional identification of or discrimination against a suspect class that warrants strict scrutiny review.[14]

¶ 37 In summary, we hold that the trial court erred in applying the strict scrutiny standard to review challenges to the Commission's redistricting plans.[15] We therefore reverse that portion of the judgment entered by the court on January 16, 2004, that invalidated the legislative redistricting plan and ordered the Commission to take additional action in constructing a new plan. We remand to the trial court to consider whether the legislative redistricting plan at issue before January 16, 2004 is rationally related to a legitimate government purpose.[16]

¶ 38 Bearing the appropriate standard of review in mind, and with the goal of providing some guidance to the trial court on remand, we now analyze the court's rulings concerning legislative redistricting and then review the propriety of granting summary judgment in the congressional redistricting portion of the case.

## II. Legislative redistricting appeal

### A. Equal Protection

¶ 39 The viability of an equal protection challenge in a redistricting case, absent evidence of racial discrimination or impairment of the right to vote, is questionable. In *Vieth*, the Supreme Court concluded that "political gerrymandering" claims are nonjusticiable, and that the Equal Protection Clause of the United States Constitution does not provide a judicially enforceable limit on political considerations that may be taken into account when redistricting. 541 U.S. at 305, 124 S.Ct. 1769. The Court held that the Constitution contains no provision that grants groups a right to proportional representation. *Id.* at 288, 124 S.Ct. 1769. In the plurality opinion, Justice Scalia pointed out that the Constitution "guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers." *Id.* Applying this reasoning, no matter how district lines are drawn, it would be impossible to guarantee a certain result in representation. *Id.* at 289, 124 S.Ct. 1769.

¶ 40 Notwithstanding the above, the Coalition asserted and the trial court found an equal protection violation because the Commission had never adopted definitions of essential terms in Article 4, Part 2, Section 1(14), of the Arizona Constitution, such as "community of interest," "extent practicable," "competitive," and "significant detriment." The trial court also concluded that the terms were not self-executing, were subject to varying definitions, and had been applied arbitrarily and capriciously in violation of the plaintiffs' equal protection rights. The trial

---

546 (2004) (holding that "[t]he Constitution clearly contemplates districting by political entities" and confirming that "[t]he reality is that districting inevitably has and is intended to have substantial political consequences.") (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)). But, "[b]y contrast, the purpose of segregating voters on the basis of race is not a lawful one." *Id.* at 286, 124 S.Ct. 1769.

14. Similarly, as no party alleges that the Commission engaged in gender bias when creating the districts, an intermediate level of scrutiny is not warranted.

15. The Commission contends that because it exercised "true legislative power," it is entitled to the "greatest" deferential standard of judicial review. We need not address this argument, however, because we have otherwise concluded that rational basis review is required.

16. The trial court, in its discretion and after consultation with the parties, can determine whether and to what extent a new trial is warranted, or whether selected submission of additional evidence and/or argument is appropriate.

court therefore ordered the Commission to adopt definitions of the aforementioned terms. The Commission contests these conclusions and argues that no authority supports them.

¶ 41 The Coalition counters that without standards to guide them, the Commissioners relied on individual, subjective *ad hoc* rationales in applying the map-drawing criteria and, in so doing, failed to treat all voters alike. Similarly, Flagstaff contends that lack of definitions both allowed the Commission to perform its work in an arbitrary fashion and prevented adequate evaluation to ensure uniform treatment. It also argues that standards are needed, for example, to assist the Commission in identifying communities of interest because if a community were placed in a single district, the votes of that community "have weight behind the[m]." [17]

¶ 42 In asserting that the Commission violated the Equal Protection Clause and failed to uniformly apply the various criteria in adopting its final 2002 legislative plan, the Coalition and Flagstaff rely on *Gore*. As previously noted, in *Bush v. Gore*, the Supreme Court found that "the use of standardless manual recounts" in a presidential election denied equal protection to some members of the electorate. 531 U.S. at 103, 121 S.Ct. 525. The Court observed that an important aspect of the right to vote is the equal weight and dignity of each vote; accordingly, having "granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05, 121 S.Ct. 525. The Florida Supreme Court seriously infringed upon this right by ordering examination of some ballots for which the voting machines had not detected a vote for president to discern the voter's intent when the counties conducting the examination used different rules to evaluate intent. *Id.* at 105, 121 S.Ct. 525. As a result, the votes of some citizens would be validated and counted while the ballots of others would not be re-examined. *Id.* at 107–08, 121 S.Ct. 525. After concluding that equal protection demanded that the ballots be evaluated by uniform rules so that similarly situated voters would be treated alike, the Court emphasized that its holding was limited "to the present circumstances, for the problem of equal protection in election processes generally presents many complexities." *Id.* at 109, 121 S.Ct. 525.

¶ 43 The Commission contends that no other court, including the Supreme Court, has cited *Gore* in a redistricting case and that *Gore* is limited to its unique facts. Flagstaff responds that *Gore* is not so limited because the Ninth Circuit cited it in *Charfauros*, 249 F.3d at 951–55, a case striking down inequitable voter qualification challenges. In *Charfauros*, an Elections Board regulation created two classes of voters based on party affiliation. *Id.* at 945. Challenges to the eligibility of one class occurred and were resolved before the election but challenges to the qualifications of the other class were not resolved until after the election, and its votes were not counted. *Id.* at 946. The Ninth Circuit agreed that the Board's regulation imposed arbitrary and disparate treatment on some citizens and cited *Gore* for the prop-

---

17. We observe that election results are not determined only by party or group affiliation, but by a variety of factors that change with each candidate and election. Therefore, to say that placing all of a "community of interest" in one district and giving "weight" to the votes of that community implicates equal protection ignores both the principle that equal protection protects the individual and the unavoidable result that individuals within the community may indeed vote differently.

As Justice Scalia noted in *Vieth*, even presuming that political gerrymandering creates more partisan representatives in fact,

the Constitution does not answer the question whether it is better for Democratic voters to have their State's congressional delegation include 10 wishy-washy Democrats (because Democratic voters are "effectively" distributed so as to constitute bare majorities in many districts), or 5 hardcore Democrats (because Democratic voters are tightly packed in a few districts). Choosing the former "dilutes" the vote of the radical Democrat; choosing the latter does the same to the moderate. Neither Article I, § 2, nor the Equal Protection Clause takes sides in this dispute.

541 U.S. at 288 n.9, 124 S.Ct. 1769. Applying this logic to "communities of interest," it is clear that the principles of equal protection would no more guarantee that a community be "packed" into one district or "cracked" into several than it would a political party.

osition that "once the legislature prescribes a particular voting procedure, the right to vote in that precise manner is a fundamental right." *Id.* at 953.

¶ 44 Both *Gore* and *Charfauros* involved denial of the right of some individuals to have their votes counted on an equal basis, but neither case applies to the Commission's redistricting efforts here. *Gore*, 531 U.S. at 100–05, 121 S.Ct. 525; *Charfauros*, 249 F.3d at 950–55. Neither the Coalition nor Flagstaff claims that Arizona lacks uniform standards to determine if a vote will be counted, as in *Gore*, 531 U.S. at 105–10, 121 S.Ct. 525, or that the redistricting plans classify voters in a way that denies or impairs their ability to vote on an equal basis with others, as in *Charfauros*, 249 F.3d at 950–51. Instead, the Coalition contends that to avoid arbitrary use or interpretation of the redistricting criteria, the Commission must adopt uniform definitions and rules.

¶ 45 The trial court accepted the assertion that lack of definitions for the criteria listed in Section 1(14) violates equal protection. It concluded as a matter of law that the terms of Section 1(14) were not "self-executing" because otherwise the Commission would not need to hire experts on competitiveness, hold hearings to identify communities of interest, or decide how to apply the various criteria. The Commission responds, however, that the court erred because Article 4, Part 2, Section 1(17) clearly states that "[t]he provisions regarding *this section* are self-executing," and the next sentence states that the Commission "shall certify [the districting maps] to the secretary of state." Ariz. Const. art. 4, pt. 2, § 1(17) (emphasis added).

¶ 46 "Self-executing" means that the legislature need not pass a statute enacting the redistricting plans. *See Chartone, Inc. v. Bernini*, 207 Ariz. 162, 166, ¶ 12, 83 P.3d 1103, 1107 (App.2004) (stating that a constitutional provision is self-executing if it is effective immediately and does not require ancillary legislation or other action). Once the Commission certifies the maps, the secretary of state must use them in conducting the next election. The trial court, however, found the various criteria set out in Section 1(14) not to be "self-executing." We do not

think the court intended to contradict the express words of Section 1(17) but meant instead that some of the critical terms in Section 1(14) are not self-explanatory or cannot be implemented without further study or investigation.

¶ 47 The Coalition insists, however, that without standards, the application of the constitutional criteria may be subject to differences of opinion among the Commissioners. Even presuming some disagreement, the Commission can take official action if at least three Commissioners cast affirmative votes. *See* Ariz. Const. art. 4, pt. 2, § 1(12). Further, although the existence of standards may aid the Commission in reaching agreement, standards do not guarantee unanimity, and unanimity is not mandated.

¶ 48 Our discussion of the role of standards in guiding the Commission illustrates the overriding fact that districting decisions require judgment, particularly because the Commission is charged with considering a number of variables that may often conflict with each other. *See, e.g., Mayor of Cambridge v. Sec'y of Commonwealth*, 436 Mass. 476, 765 N.E.2d 749, 755 (2002) (acknowledging that the redistricting process requires the use of discretion and compromise); *State ex rel. S. St. Paul v. Hetherington*, 240 Minn. 298, 61 N.W.2d 737, 742 (1953) (acknowledging that those charged with redistricting must exercise their own discretion, but that there are limits thereon), *cited in Ziols v. Rice County Bd. of Comm'rs*, 661 N.W.2d 283, 287 (Minn.App.2003). At present, it is not possible to produce a perfect map by feeding data into a computer. Instead, the people of Arizona have entrusted a politically balanced group of five individuals with discretion to reach reasonable conclusions on how to draw district lines. Even if the Commission adopts a definition of "competitive" or "compact" so that proposed districts may be measured against an agreed-upon yardstick, the Commission still must have flexibility to give more emphasis to one goal over another when, for example, to respect a community of interest, a district must be less compact and contiguous.

¶ 49 This is not to say that the Commission can ignore any of the constitutional cri-

teria, can favor one criterion without considering the others, or can apply or interpret them in a way that no rational Commission would. However, the Coalition has not demonstrated that equal protection principles demand definitions in order to prevent the Commission from invidiously discriminating against some voters. We find no basis in the Equal Protection Clause to compel the Commission to adopt definitions, and the trial court's order in that regard was error.

### B. Competitiveness as an equal goal under the Arizona Constitution

■ ¶ 50 The trial court ruled that "[c]reating competitive districts is no less important than meeting any of the other goals of Article 4, [P]art 2, [Section] 1(14)(B)—(E) and, in fact, is mandatory." Consequently, the court concluded that the Commission misinterpreted Article 4, Part 2, Section 1(14) as subordinating the competitiveness goal and violated that provision by failing to favor competitiveness in establishing districts. Specifically, the court ruled that the Commission erred by addressing competitiveness only after it considered the goals set forth in subsections (B)—(E), was not permitted "to create homogenous districts comprised of like-minded, yet distinct, communities of interest, at the expense of [creating] competitive districts," and failed to favor competitiveness by creating majority-minority districts with Hispanic voting populations in excess of the requirements of Section 5 of the VRA. The court further found that a more competitive plan was plausible based on the existence of a proposed plan known as the "Hall–Minkoff Plan," which the Commission had rejected. Ultimately, the court ordered the Commission "to adopt a legislative plan that gives appropriate consideration to competitiveness" and "at a minimum contains the same number of competitive districts [seven] as the Hall–Minkoff Plan."

¶ 51 The Commission and AFLR [18] argue that the trial court erred by elevating the importance of competitiveness as described in Article 4, Part 2, Section 1(14). They contend the plain meaning of the constitution subordinates competitiveness as a factor to consider in the redistricting process. The Coalition responds that because competitiveness is the only goal "favored" in Article 4, Part 2, Section 1(14), and all constitutional provisions are mandatory unless specifically described as discretionary, the court's ruling on this issue was correct. We review this issue de novo as a question of law. *Circle K Stores, Inc. v. Apache County*, 199 Ariz. 402, 405, ¶ 7, 18 P.3d 713, 716 (App.2001).

■ ¶ 52 To understand the contours of a constitutional provision, we begin, as always, by examining its language. In interpreting Article 4, Part 2, Section 1(14), our primary focus is on the intent of the electorate that voted to amend the constitution, *Jett v. City of Tucson*, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994), "and we do not [step] outside the plain language of the provision unless the language is unclear." *Phelps Dodge Corp. v. Arizona Elec. Power Coop., Inc.*, 207 Ariz. 95, 109, ¶ 42, 83 P.3d 573, 587 (App.2004). If we find the language unclear, we may then consider "the context, effect, consequences and spirit of the law." *State v. Superior Court (Coronado)*, 186 Ariz. 363, 365, 922 P.2d 927, 929 (App.1996). Finally, we give words their natural, obvious and ordinary meaning unless defined otherwise in the constitution. *McElhaney Cattle Co. v. Smith*, 132 Ariz. 286, 290, 645 P.2d 801, 805 (1982). With these principles in mind, we examine the language of the constitutional provisions at issue.

¶ 53 Article 4, Part 2, Section 1(14)—(15), sets forth a four-phase method the Commission must follow in establishing legislative and congressional districts. During phase one, the Commission must create "districts of equal population in a grid-like pattern across the state." Ariz. Const. art. 4, pt. 2, § 1(14). The Commission cannot consider party registration and voting history data during this phase. *Id.* at § 1(15). The Commission is additionally prohibited from identifying or considering the places of residence of incumbents or candidates. *Id.* No party disputes

---

**18.** Intervenors-appellants Mohave County, City of Kingman, and Lake Havasu City join in the arguments urged by the Commission and AFLR on this issue.

this description of the Commission's constitutional mandate during this phase.

¶ 54 In phase two, the Commission "shall" make adjustments to the grid created during phase one "as necessary to accommodate" six listed goals. *Id.* at § 1(14)(A)—(F). It is the priority and binding nature of these goals that form the crux of the parties' dispute. Thus, we again quote the language of the contested provision:

A.   Districts shall comply with the United States [C]onstitution and the [U]nited [S]tates [V]oting [R]ights [A]ct;

B.   Congressional districts shall have equal population to the extent practicable, and state legislative districts shall have equal population to the extent practicable;

C.   Districts shall be geographically compact and contiguous to the extent practicable;

D.   District boundaries shall respect communities of interest to the extent practicable;

E.   To the extent practicable, district lines shall use visible geographic features, city, town and county boundaries, and undivided census tracts;

F.   To the extent practicable, competitive districts should be favored where to do so would create no significant detriment to the other goals.

*Id.* at § 1(14). The Commission may use party registration and voting history data to test maps for compliance with these goals. *Id.* at § 1(15). As in phase one, however, the Commission cannot identify or consider the places of residence of incumbents or candidates when completing phase two. *Id.*

¶ 55 In phase three, the Commission must advertise draft maps of the legislative and congressional districts drawn during the initial phases and take public and legislative comment for thirty days. *Id.* at § 1(16). Finally, in phase four, the Commission establishes final district boundaries and certifies the new districts to the secretary of state. *Id.* at § 1(16)—(17).

¶ 56 The parties agree that the initial requirement of phase two is compliance with the federal constitution and the VRA. Their agreement ends there. The Commission and

AFLR argue that use of the word "should" in Section 1(14)(F), coupled with the deferential reference to the goals listed in Section 1(14)(A)—(E), plainly evidences the electorate's intent that competitiveness constitute a subordinate goal in establishing districts. AFLR additionally contends that use of the word "should" permits the Commission to "completely ignore[ ] the 'competitive' goal" in establishing districts. The Coalition responds that application of principles of constitutional construction and review of the publicity pamphlet for Proposition 106 indicate that use of "should" in Section 1(14)(F) signifies a mandatory goal. Additionally, it asserts that because competitiveness is the only "favored" goal, it is preeminent unless its satisfaction causes significant detriment to other listed goals.

¶ 57 We agree with the Coalition that the word "should" in Section 1(14)(F) does not permit the Commission to entirely ignore the competitiveness goal. First, the word "should" is commonly used to express obligation or duty. *McNutt v. McNutt*, 203 Ariz. 28, 34, ¶ 26, 49 P.3d 300, 306 (App.2002) (citing *The American Heritage Dictionary* 1670 (3d ed.1992)); *see also Black's Law Dictionary* 1237 (5th ed.1979) (defining "should" in part as "ordinarily implying duty or obligation" and "not normally synonymous with 'may' "). Consequently, just as "shall" generally indicates a mandatory provision, *Walter v. Wilkinson*, 198 Ariz. 431, 432, ¶ 7, 10 P.3d 1218, 1219 (App.2000), "should" assumes a similar meaning. *See McNutt*, 203 Ariz. at 34, ¶ 26, 49 P.3d at 306 (holding language in child support guidelines that court "should" allocate federal tax exemption mandates such action).

¶ 58 Second, although mandatory terms can be directory depending on the context or usage, we do not discern such an intent in Section 1(14)(F). *See Ariz. Libertarian Party v. Schmeral*, 200 Ariz. 486, 490, ¶ 10, 28 P.3d 948, 952 (App.2001) ("We acknowledge that 'shall' may be interpreted as indicating desirability, preference, or permission, rather than mandatory direction . . . ."). The Commission and AFLR contend we should infer this intent because the electorate failed to use the term "shall" in subsection (F), while

doing so in subsections (A)—(E). *See In re Guardianship of Cruz*, 154 Ariz. 184, 185, 741 P.2d 317, 318 (App.1987) (inferring from use of "may" and "shall" in a statute that the legislature was aware of the difference between mandatory and directory verbs and intended different meanings). Although use of directory and mandatory terms in close context may evidence a drafter's intent to adhere to the traditional definitions of those terms, *see id.*, use of alternative words that convey mandatory meaning does not similarly indicate a desire that one term convey a directory meaning. And, as the Coalition points out, our constitution provides that its provisions "are mandatory, unless by express words they are declared to be otherwise." Ariz. Const. art. 2, § 32. Because the language of Section 1(14)(F) does not expressly indicate that "should" is used in a nontraditional manner, we adhere to its generally accepted definition. For these reasons, we reject AFLR's contention that the electorate used the word "should" in Section 1(14)(F) to permit the Commission to completely ignore the goal of competitiveness in establishing districts.

¶ 59 However, having concluded that "should" is used in a mandatory sense, we further conclude that it does not elevate subsection (F) to a position of dominance over subsections (B)—(E). We instead agree with the Commission and AFLR that qualifying language in Section 1(14)(F) plainly subordinates the competitiveness goal to the goals listed in Section 1(14)(B)—(E). The goals listed in subsections (B)—(E) must be accomplished "to the extent practicable," with equal priority. Although the competitiveness goal is prefaced with the words "[t]o the extent practicable," only that goal is "favored where to do so would create no significant detriment to the other goals." Consequently, the competitiveness goal does not share equal priority with the goals set forth in subsections (B)—(E). Rather, the Commission must favor competitive districts when the other goals would not suffer significant detriment. *See Ariz. Minority Coalition v. Ariz. Indep. Redistricting Comm'n*, 284 F.Supp.2d 1240, 1244 (D.Ariz.2003) (observing "the Arizona Constitution mandates that the Commission favor competitive districts,

though it diminishes the significance of this goal below the importance of the five other goals listed in the Clause"). Stated differently, if drawing competitive or more competitive districts would not be practicable or would cause significant detriment to the goals listed in subsections (B)—(E), the Commission must refrain from establishing such districts. Conversely, if it would be practicable to draw competitive or more competitive districts and to do so would not cause significant detriment to the goals listed in subsections (B)—(E), the Commission must establish such districts.

¶ 60 Finally, the Coalition argues that the publicity pamphlet for Proposition 106 and related information evidence the electorate's intent that competitiveness be the primary goal in establishing legislative and congressional districts. Similarly, the trial court found that the publicity pamphlet urging adoption of Proposition 106 emphasized that "a primary purpose of Proposition 106 was to insure the creation of competitive congressional and legislative districts." However, neither the Coalition nor the court points to any language in Section 1(14) that is unclear, thereby justifying review of or reliance on the pamphlet to discern the electorate's intent. Consequently, and because we do not find the language of Section 1(14) ambiguous, we do not consider this extraneous evidence. *Phelps Dodge*, 207 Ariz. at 109, ¶ 42, 83 P.3d at 587.

¶ 61 In summary, the trial court erred by ruling that creation of competitive districts is no less important than any of the other goals listed in Sections 1(14)(B)—(E), and that the Commission erred in treating competitiveness as a subordinate goal.

## C. Other issues likely to arise on remand

### 1. Identification and consideration of incumbents' places of residence

¶ 62 The trial court also found that the Commission "considered" the locations of incumbents during the redistricting process in contravention of Article 4, Part 2, Section 1(15). That provision states that "[p]arty registration and voting history data shall be

excluded from the initial phase of the mapping process but may be used to test maps for compliance with the above goals. *The places of residence of incumbents or candidates shall not be identified or considered."* Ariz. Const. art. 4, pt. 2, § 1(15) (emphasis added).

¶ 63 At trial, the Coalition offered some evidence that the Commission, through its counsel and/or consultants, possessed information that identified the proposed districts in which incumbents would be located. The Commission objected, noting that its consultant, Dr. Michael McDonald, needed this information to test the competitiveness of the proposed plan, and that the Commission, through its counsel, was required to obtain and convey such information to the DOJ as part of that agency's review of the plans for compliance with the VRA. The trial court overruled the Commission's objection.

¶ 64 In formulating its findings of fact and conclusions of law, the trial court accepted the Coalition's proposed finding that "[t]o prevent the Commission from constructing ... districts to benefit particular incumbents ... Proposition 106 also specifically prohibits the Commission, which includes its agents and attorneys, from *identifying or considering the places of residences of incumbents* or potential candidates at any time during the redistricting process." (Emphasis added.) The court also accepted that soon after adopting the final draft map, on or about September 4, 2001, the Commission's attorneys provided information to NDC and McDonald about the location of legislative and congressional incumbents. Again in April 2002, the Commission and another consultant "obtained information regarding the location of incumbents" in the 2001 Adopted Legislative Plan and in the Coalition II Revised Plan.[19]

¶ 65 The court acknowledged that on February 27, 2002, the Commission's counsel had responded to DOJ's requests for a list of incumbents and their districts under both the 1990 and the proposed plans by stating that the Commission was prohibited "from identifying or considering the places of residence of incumbents." Counsel then informed DOJ of a source, apparently AFLR, that could identify where incumbents would reside in the proposed districts. However, the court found DOJ's request came long "after the Commission first gathered and considered information about incumbent residences." Further, "DOJ's request does not explain the Commission's subsequent consideration of the impact of the Coalition II Revised Plan on incumbents." Thus, the court found that the Commission violated Article 4, Part 2, Section 1(15) "through its identification and consideration of the residences of incumbents." [20]

¶ 66 The Commission argues that the trial court's factual findings and legal conclusions are incorrect. It concedes it may not use incumbents' residences to draw district lines but maintains that this does not mean the Commissioners or their agents are forbidden from *knowing* whether a district contains an incumbent. The key question, the Commission asserts, is not whether information about the location of incumbents in past or proposed districts was in the hands of Commission agents but whether the Commission or its agents *used* addresses of incumbents as a basis for drawing or making adjustments to various maps.[21]

19. The court referenced several exhibits including an Arizona News Service chart dated August 31, 2001, which lists thirty proposed legislative districts, and for each district, the name of any incumbent senator or representative; the percentage of registered Democratic, Republican, or other voters in each district; and a location of the district such as "N. Arizona," "Yuma County," "W. Tucson," "Sun City," or "Chandler, Gilbert." Another chart lists the name of each incumbent representative and senator, a letter indicating his or her proposed district, and the names of other incumbents in that district. For example, in proposed district A, two named incumbents are located in "N. Ariz." and for district AA, a named incumbent is located in "W. Tucson."

20. The court's findings, however, do not explain in what way the Commission *considered* the impact of the Coalition II Revised Plan on incumbents or how that consideration affected the Commission's redistricting plans.

21. Knowledge of actual street addresses would be necessary if the Commission wished to consider incumbent locations during the line drawing because Doug Johnson, the NDC employee who operated the computer software that actually

¶ 67 As the Commission argued at trial, reading Article 4, Part 2, Section 1(15) to prohibit the Commission from knowing anything about incumbent locations presents a number of practical problems. When a constitutional provision is unclear, we consider its effect, consequences, context, and spirit. *Coronado*, 186 Ariz. at 365, 922 P.2d at 929. As soon as the Commission proposes a map, newspapers and other interested parties, armed with incumbents' addresses, can simply match incumbents with the proposed districts and publish charts indicating which incumbents would be in which districts.[22] None of the lists or charts that are part of this record reveal actual addresses, but one witness stated that incumbents' addresses are readily available from the secretary of state's office and its website.

¶ 68 The Commission's counsel also observed at trial that, as here, groups aligned with political parties, partisan citizen groups, or others may propose their own redistricting plans. Although a partisan group is free to use incumbents' addresses as the basis for drawing its proposed map, the Commission could not necessarily discern a bias in favor of or detrimental to incumbents when a proposed map comes from an external source. Furthermore, several elected representatives appeared at the Commission's public hearings to offer comments, and as all speakers did, filled out slips that asked for a name and address. Commission staff had to remove the addresses so that the Commission record would not contain any incumbents' addresses. But, a total ban on disclosure of incumbents' geographic locations would plainly diminish the usefulness of public input if, for example, incumbents were forbidden from offering suggestions on communities of interest or other issues because in doing so they might disclose their location in a particular district.

¶ 69 Additionally, it may stretch credulity to think that the Commissioners, four of whom are appointed by the highest ranking officers in the state legislature, have no personal knowledge of at least the city in which some congressional or legislative incumbents reside. Presumably, each Commissioner votes in a district, likely knows his or her own representatives, and may know where other representatives live or which districts they represent.

¶ 70 These practical difficulties strongly suggest that Section 1(15) seeks not to erase all knowledge that there are incumbents located throughout the state who may or may not be "redistributed" by the new maps but rather is intended to prevent the Commission from attempting to either strengthen or weaken the incumbents' political bases when deciding how to draw new district lines. Section 1(14) expressly enumerates the criteria to guide the Commission's discretion in drawing district lines, and Section 1(15) states as explicitly that incumbents' places of residence "shall not be identified or considered." Implicit in this prohibition is the qualification, "when drawing district lines."

¶ 71 We attempt to give our constitution a sensible meaning. In this instance, we cannot ignore that not only may the Commissioners and their agents know the general locations of many incumbents, but that this knowledge is shared with or is available to any citizen, political party, or special interest group that wishes to propose districts. Additionally, the Commissioners and their agents could inadvertently learn of specific addresses of incumbents.

¶ 72 The purpose of Section 1(15) is not to require that ignorant and uninformed Commissioners and staff carry out the redistricting process. Rather it is to prevent the Commission from drawing new districts to either aid or hinder the interests of candidates or incumbent legislators in future elec-

---

drew the districts, testified that he did not move whole districts. Instead, in drawing maps and making adjustments, he moved only portions of a district either in or out. Without knowing an incumbent's exact location in a district, the line changes could easily place the incumbent in a different district.

22. For example, an employee of the Republican Party testified that he put together a map showing the impact of the 2002 election results on incumbents and maps showing incumbent locations in two proposed plans for 2004 and forward. On the latter maps, he indicated precise incumbent locations based on addresses obtained from the secretary of state's office.

tions. The key is the presence of *knowledge* combined with the *use of that knowledge* in drawing the new district lines. We think it unwise to adopt a highly impractical interpretation of Section 1(15) that forbids any of the Commissioners, their staff, counsel, or consultants from knowing in what existing or proposed districts an incumbent may be located or learning of an incumbent's address. Mere knowledge of even the specific residence of an incumbent, without the use of such knowledge to draw boundary lines, cannot render a plan unconstitutional. If it did, then once such information came within the knowledge of a Commissioner or, as here, the entire Commission and staff, all persons with such knowledge could no longer serve, and new Commissioners would have to be selected. That absurd result could not have been intended.[23]

¶ 73 No party has cited any evidence that the Commission gave directions to its map consultants based on the Commission's knowledge of incumbents' residences. The Commission concedes that the Commissioners knew that each old legislative district had three possible incumbents but argues that the Commissioners never pinpointed the precise locations of those incumbents by addresses. Without an address, the Commissioners could not consider how a proposed map would affect incumbents. Moreover, no one has cited a single remark by any Commissioner indicating that he or she considered even the general locations of incumbents, let alone their addresses. Further, no one has cited any directive to NDC that suggests the Commissioners considered incumbents' locations when drawing lines or choosing which plans to test for possible adoption. Similarly, even though McDonald asked for and received information on incum-

bents' locations in his September 1, 2002 e-mail, no one has alleged that McDonald used this information to influence the Commission.[24]

¶ 74 The Coalition had the burden of proof on this issue. During trial, however, it simply cited the April 17, 2002 e-mail between Commission counsel and its consultants listing the locations of incumbents under the Coalition II Revised Plan to contend that the list could not have been compiled without incumbent addresses. Although AFLR's counsel avowed at trial that his organization had provided the information on incumbents' placement in the Coalition's map, the Coalition failed to prove that the Commission used this information to draw district lines. Furthermore, when the trial court ordered the Commission to recreate legislative districts, it did so with the awareness that the Commission had some knowledge of incumbents' residences. Nevertheless, no party objected to the Commission's ability to act merely because of this knowledge. In other words, no one suggested that *knowledge alone* would disqualify the Commissioners from service.[25]

¶ 75 We have reversed the portion of the January 16, 2004 judgment invalidating the legislative redistricting plan, including the court's findings and legal conclusions on this issue. In light of our interpretation of Article 4, Part 2, Section 1(15), the trial court is free to reconsider those findings and conclusions on remand.

### 2. Disclosure of Johnson communications

¶ 76 In April 2002, the Commission identified its consultant, Douglas Johnson, as a trial expert. In response, the Coalition re-

---

**23.** To so opine would mean that a Commissioner would be automatically disqualified in his role if an incumbent moved in next door, if an incumbent's address was printed in a publication and read by the Commissioner, or if an overzealous citizen contacted a Commissioner and disclosed an incumbent's address.

**24.** McDonald's initial analysis of the 2000 elections used data on incumbents because he knew the districts in which incumbents lived, and again after the 2002 elections, he knew which districts had incumbents so he could "construct

a measure of the vote in the district hypothetically [as] if no incumbent had run in the district."

**25.** We also note the Commission is required to draw districts in compliance with the VRA and Article 4, Part 2, Section 1(14)(A), and is also required to submit redistricting plans to DOJ for preclearance. *See supra* note 4. We see nothing wrong with the Commission providing incumbency data, including location, to DOJ as part of that process.

quested copies of all documentation reviewed by Johnson. The Commission disclosed some documents, but objected to others, citing various privileges, including legislative privilege. The Coalition filed a motion to compel, after which the Commission changed Johnson's designation from an expert witness to a fact witness. The trial court granted the Coalition's subsequent motion to compel, ruling that the legislative privilege did not apply to the Commission's consultants. The Commission then redesignated Johnson as an expert witness.

¶ 77 The Commission sought special action review of the court's ruling. We accepted jurisdiction and opined that the legislative privilege applies to all communications, including written documentation, between the Commission and its consultants. *Ariz. Indep. Redistricting Comm'n v. Fields,* 206 Ariz. at 140–41, ¶¶ 30, 32, 75 P.3d at 1098–99. We further held, however, that a "commissioner can waive the privilege ... by designating that consultant as a testifying expert." *Id.* at 144, ¶ 48, 75 P.3d at 1102. We concluded that the Commission had waived its legislative privilege regarding communications with its designated experts and materials related to their testimony that they had reviewed. *Id.* at 144–45, ¶ 50, 75 P.3d at 1102–03.

¶ 78 In light of our ruling, we ordered the Commission to "immediately identify those documents listed on its privilege log" that it determined were protected by the legislative privilege and had not been waived. *Id.* at 145, ¶ 51, 75 P.3d at 1103. We then instructed that

> [t]he [Commission] shall immediately produce to the Coalition all remaining documents listed in the privilege log. Thereafter, and without undue delay, the [Commission] shall submit any documents it deems privileged and not waived to the trial court for an *in camera* inspection. The court shall then decide whether these documents are shielded by the legislative privilege.

*Id.* We also held, however, that

> the [Commission] and its attorneys exclusively control the selection of its testifying experts. Thus, the [Commission] can

avoid waiving any legislative privilege by simply selecting testifying experts who did not also serve as pre-litigation consultants.

*Id.* at 144, ¶ 49, 75 P.3d at 1102.

¶ 79 Two days after we issued *Fields,* the Commission redesignated Johnson as a fact witness, apparently to preserve the Commission's legislative privilege. At a hearing on that issue on October 31, 2003, the trial court interpreted our holding to mean that the Commission's prior act of designating Johnson as an expert had created the waiver. It ruled that the Commission could not later change Johnson's designation and thereby regain the protection of the privilege. It further ruled that its review of the documents previously disclosed by the Commission revealed that Johnson would be testifying, at least in part, as an expert, regardless of the designation given him by the Commission. On that basis, the trial court directed the Commission to produce "any documents relating to the subject matter of ... Johnson's testimony as designated when he was designated as an expert witness ...." Since the Commission had not yet followed this court's order to separate the documents it deemed privileged and submit them to the trial court for determination of whether the legislative privilege applied, the trial court commented, "I understand the Court of Appeals wants me to review those documents to make sure they fall within that area of expertise, so I'm [going to] need what he was designated as, as well as the documents, if you want me to review them."

¶ 80 In response to the trial court's ruling, the Commission produced "thousands of pages of communications," which included information relating to Johnson's fact-witness testimony, without first submitting them to the trial court for the ordered *in camera* inspection. At trial, over repeated objection by the Commission, the Coalition admitted two of these documents as proof that the Commission wrongfully considered incumbents' residences in its redistricting process. *See supra* ¶¶ 62–75.

¶ 81 On appeal, the Commission argues that the trial court should have allowed it to redesignate Johnson as a fact witness and

thereby "avoid waiving" its legislative privilege. The Commission also argues that it was error for the trial court to "force" the Commission to disclose all documents regarding Johnson's work as a consultant. The Coalition, on the other hand, claims that the Commission voluntarily disclosed the documents without an *in camera* inspection and thus waived its privilege.

¶ 82 A trial court " 'has broad discretion in ruling on discovery and disclosure matters,' and we will not disturb its ruling absent an abuse of discretion." *Link v. Pima County*, 193 Ariz. 336, 338, 972 P.2d 669, 671 (App.1998) (quoting *Rosner v. Denim & Diamonds, Inc.*, 188 Ariz. 431, 434, 937 P.2d 353, 356 (App.1996)). Here, the trial court misinterpreted the impact of the Commission's redesignation of Johnson as an expert witness. *See Fields*, 206 Ariz. at 144–45, ¶¶ 49–51, 75 P.3d at 1102–03. The court apparently read *Fields* to mean that the Commission's mere expert designation of Johnson created a permanent waiver of legislative privilege that could not be revoked by redesignating him as a fact witness. *See id.* It did not.

¶ 83 *Fields* stands for the proposition that the legislative privilege is waived when a consultant has been designated as the party's expert *and* will testify as an expert. *Id.* Thus, a party who has named a consultant as an expert can reinstate the privilege by removing that designation before expert opinion evidence is offered through production of a report, responses to discovery, or expert testimony. *See id.*

¶ 84 Moreover, the Commission may decide which experts it will call to testify at trial. *See Perguson v. Tamis*, 188 Ariz. 425, 430, 937 P.2d 347, 352 (App.1996) ("Once a party has agreed or is ordered to limit his or her timely-disclosed but overlapping experts, ... that party, not adverse parties, should get to choose which expert(s) will or will not be used at trial."). As courts interpreting the Federal Rules of Civil Procedure have determined, once an expert witness is redesignated, the opposing party is strictly limited to disclosure related to the new designation. *See, e.g., Mantolete v. Bolger*, 96 F.R.D. 179, 182 (1982). In *Mantolete*, the court reasoned that when a defendant changed its expert's designation from "testifying expert" to "non-testifying" expert under Rule 26(b)(4) of the Federal Rules of Civil Procedure, discovery by plaintiff was limited to the restrictions set forth for non-testifying experts. *Id.* The court rejected the plaintiff's argument that the redesignation of the witness was simply a way to avoid discovery and thus a gross abuse of the federal rules. *Id.* at 182 n. 2. Instead, the court opined that the "defendant is permitted to execute the trial strategy it deems appropriate to defend its case; this extends to changing the status of an expert, which thereby narrows the scope of discovery." *Id.* (citing *Bailey v. Meister Brau, Inc.*, 57 F.R.D. 11, 13–14 (N.D.Ill.1972)).

¶ 85 We agree with the analysis in *Mantolete*. The Commission was entitled to change Johnson's designation, which in turn limited the opposing parties' right to discovery related to Johnson's new designation as a fact witness, thereby preserving the applicable legislative privilege.

¶ 86 Notwithstanding the retention of its privilege, the Commission produced apparently privileged documents without first providing the documents to the trial court for an *in camera* inspection. The Coalition contends that the Commission's release of the documents was "voluntary" because it was not in strict accordance with the trial court's directive. It therefore reasons that the Commission has waived its opposition to the disclosure of privileged documents. We disagree.

¶ 87 The Commission strenuously protested the release of these documents before and during trial, and even pursued a special action in this court contesting such disclosure. After the conclusion of the special action, the trial court ruled that the Commission had waived the legislative privilege protecting communications between it and Johnson regardless of his new status as a fact witness. Thus, an *in camera* inspection of documents reflecting communications between the Commission and Johnson would not have shielded these documents from production, as the Commission likely realized. In light of these circumstances, we cannot

view the Commission's production of privileged documents without the *in camera* inspection as a voluntary waiver of the legislative privilege. Rather, it is clear that the Commission believed it was compelled to disclose any documents that related to Johnson's testimony.

¶ 88 Of course, when an expert is redesignated as a fact witness, the privilege remains in effect only for so long as the witness does not testify or testifies only as a fact witness. The privilege is waived, however, and the expert-based documents become discoverable, when the fact witness is redesignated as an expert witness, and will testify as such. It is also waived to the extent that trial testimony exceeds the fact-witness designation.

¶ 89 Accordingly, we hold that the trial court erred in ruling that the mere act of designating a consultant as a testifying expert witness permanently waived the legislative privilege. On remand, the trial court should apply the principles set forth herein. To the extent the parties cannot agree on which documents are privileged, the trial court shall conduct an *in camera* inspection in order to determine the application of the privilege. In the event of a re-trial, and in the event Johnson's testimony strays into the realm of expert testimony, any documents relevant to such expanded testimony will be subject to disclosure. *See Link,* 193 Ariz. at 338, 972 P.2d at 671.

### 3. Use of personal knowledge and experience

¶ 90 We next consider whether Commissioners are prohibited from using personal knowledge and experience in the redistricting process. The Coalition states that use of personal knowledge is permitted as long as the Commission is applying uniform standards. The Commission argues that the trial court erred in faulting the Commissioners for relying on their personal experience and in finding such reliance to be evidence of arbitrary *post hoc* justifications. The Commission cites *Bush v. Vera,* a racial gerrymandering case, in which the Court rejected the state's claims that community of interest and incumbency protection explained

district lines. 517 U.S. at 966–67. In *Vera,* Justice O'Connor acknowledged that, when redistricting, legislators could use their districting experience to achieve permissible political gerrymandering "regardless of [their] awareness of [the] racial implications." *Id.* at 968, 116 S.Ct. 1941. Justice O'Connor's observation is of questionable relevance here, but we nevertheless assume that candidates for a position on the Commission bring their personal knowledge and experience to the task. We know of no constitutional principle that requires Commissioners to ignore that knowledge or experience although, as we have emphasized, their discretion is not unfettered. Simple reliance on personal knowledge and experience cannot substitute for careful and honest consideration and application of the criteria in Section 1(14).

### III. Congressional redistricting appeal

¶ 91 The Navajo Nation and Leonard Gorman (collectively "Nation") appeal the trial court's grant of summary judgment in favor of the Commission, AFLR, and the Hopi Tribe ("Tribe") on the Nation's complaint and the corresponding denial of summary judgment in favor of the Nation. The Nation argues that the court erred in its rulings because as a matter of law the Commission violated Article 4, Part 2, Section 1(14), of the Arizona Constitution, by granting the Tribe's request to be in a different congressional district than the Nation. Specifically, according to the Nation, by placing the Nation into district 1 and the Tribe and 42 Nation residents into district 2, the Commission violated Section 1(14)(C), (D) and (E) by splitting the Nation's community of interest, constructing districts that are neither compact nor contiguous, and dividing census tracts. Additionally, the Nation argues that although the trial court properly stated that it should employ strict scrutiny review in deciding whether the Commission violated Section 1(14), the court misapplied that standard.

¶ 92 We quickly dispatch the Nation's last contention. The Nation asserts, and the trial court agreed, that because the congressional redistricting plan implicates the fundamental right to vote, the court must apply strict scrutiny review to determine

whether the plan complies with the constitution. *See Ruiz v. Hull,* 191 Ariz. 441, 448, ¶ 25, 957 P.2d 984, 991 (1998) ("[W]here the regulation in question impinges on core constitutional rights, the standards of strict scrutiny apply and the burden of showing constitutionality is shifted to the proponent of the regulation."). As previously explained, however, *see supra* ¶¶ 23–33, the right to vote is not implicated by redistricting plans. Thus, strict scrutiny review does not apply, and we need not decide whether the trial court properly employed that standard. Rather, the court was required to reject the Nation's challenge if the congressional redistricting plan had a reasonable, even though debatable, basis for adoption unless the plan clearly violated the constitution. *State v. Murphy,* 117 Ariz. 57, 61, 570 P.2d 1070, 1074 (1977); *see also Standhardt v. Superior Court,* 206 Ariz. 276, 280, ¶ 9, 77 P.3d 451, 455 (App.2003); *supra* ¶¶ 15–17. Additionally, the court was required to presume the constitutionality of the plan unless the Nation proved otherwise. *Ruiz,* 191 Ariz. at 448, ¶ 25, 957 P.2d at 991. Bearing these principles in mind, we now address the Nation's allegations of error concerning the Commission's compliance with Article 4, Part 2, Section 1(14).

## A. Respecting communities of interest—Section 1(14)(D)

■ ¶ 93 Article 4, Part 2, Section 1(14)(D) requires the Commission to create district boundaries that "respect communities of interest to the extent practicable." The Nation argues that the Commission violated this provision by placing Nation residents in more than one district to accommodate the Tribe's request to be in a different district than the majority of Nation residents. The Commission and AFLR[26] respond that placement of the majority of the Nation residents and the Tribe in separate districts was necessary to respect the Tribe's community of interest. No party contests that the Nation and the Tribe are separate "communities of

interest," as that term is used in Section 1(14)(D). Resolution of this issue therefore turns on whether and to what extent the Commission can accommodate the wishes of one community of interest by splitting another community of interest.

¶ 94 We commence our analysis by deciding what is meant by "respect[ing]" a "communit[y] of interest." As the Nation points out, the plain meaning of the word "respect" is "[t]o avoid violation of or interference with." *Webster's II New College Dictionary* 944 (2001). Thus, under Section 1(14)(D), to the extent practicable, district boundaries must avoid violating or interfering with communities of interest. Indisputably, the congressional plan interferes somewhat with the Nation's community of interest by placing 42 of its 104,000 residents into district 2 rather than into district 1 with the remainder of the Nation's Arizona residents.[27] The Nation acknowledges that the Commission can validly split a community of interest to accommodate the other goals set forth in Section 1(14), and we agree. *Fields,* 206 Ariz. at 138, ¶ 22, 75 P.3d at 1096 (noting Section 1(14) permits Commission to balance Section 1(14) goals to arrive at final plan). However, because the Commission did so in this case solely to accommodate the political wishes of another community of interest, which is not a goal listed in Section 1(14), the Nation argues that the Commission could not validly divide the Nation into two districts. The Commission and AFLR counter that removing the Tribe from district 1 respected the Tribe's community of interest and was therefore a valid goal under Section 1(14)(D) that could be balanced against the Nation's interests. We agree with the Commission and AFLR.

¶ 95 The Nation contends that the lone way to "respect" a community of interest is to refrain from geographically splitting that community into separate districts, thereby preserving the community's voting power concerning issues of common interest. Consequently, the Nation asserts that keeping

---

**26.** The Hopi Tribe joins in the answering briefs filed by the Commission and AFLR.

**27.** The Nation lies within the borders of Arizona, Utah, and New Mexico, covering over 27,000 square miles. The record reflects that the entire Nation contains approximately 104,000 residents.

the Tribe in district 1 with the Nation sufficiently "respected" the interests of the Tribe. While we agree that placing the entirety of a community of interest into a single district is one way to respect that community, we do not read Section 1(14)(D) as saying this is the only way of demonstrating such "respect."

¶ 96 First, as the Commission points out, Section 1(14)(D) does not state that communities of interest shall not be split and does not provide that their *boundaries* shall be respected. Rather, Section 1(14)(D) broadly states that *communities of interest* shall be respected. By separating two communities of interest with competing political interests, the Commission refrains from interfering with the minority community's interests by allowing it to seek representation free from the dominant influence of a competing community. *See Arizonans for Fair Representation v. Symington*, 828 F.Supp. 684, 690 (D.Ariz.1992) (placing Nation and Tribe into separate districts in court-ordered plan "[o]ut of respect" for historical tension and present competition between communities); *Carstens v. Lamm*, 543 F.Supp. 68, 99 (D.Colo.1982) (holding two rival counties properly placed in separate districts as "[t]he competitive atmosphere between these two counties is contrary to the concept of communities of interest").

¶ 97 Second, Section 1(14)(E) explicitly addresses the manner in which district boundaries must use community boundaries. Ariz. Const. art. 4, pt. 2, § 1(14)(E) ("To the extent practicable, district lines shall use visible geographic features, city, town and county boundaries, and undivided census tracts."). The only conceivable goal of this subsection is to avoid splitting communities to the extent practicable. Because the voters failed to employ similarly explicit language in Section 1(14)(D) concerning communities of interest, we conclude for this additional reason that the provision permits the Commission to "respect" a community of interest in ways other than simply placing the community into a single district. *See State v. Thomason*, 162

Ariz. 363, 366, 783 P.2d 809, 812 (App.1989) ("A statute should be explained in conjunction with other statutes which relate to the same subject or have the same general purpose.") (citing *State ex rel. Larson v. Farley*, 106 Ariz. 119, 471 P.2d 731 (1970)).

¶ 98 Finally, as AFLR contends, the initiative history for Section 1(14)(D) supports our broader view of that provision. In the Official Title for Proposition 106, which appeared on the ballot, the text stated that the proposed independent redistricting commission would "oversee the mapping of fair and competitive congressional and legislative districts." Authorizing the Commission to respect a community of interest by placing it into a separate district from a rival and dominant community promotes the concept of "fair districts."

¶ 99 For these reasons, we hold that Section 1(14)(D) permits the Commission to respect a community of interest by placing it into a district separate from one containing a dominant community of interest with competing political interests. The Nation does not contest, and the stipulated facts before the trial court reflect, that the Nation and the Tribe are distinct communities of interest with historical and present-day, opposing federal interests. Consequently, in balancing the goals listed in Section 1(14), the Commission could properly "interfere" with the Nation's community of interest in order to accommodate the Tribe's interests.

¶ 100 The Nation next argues that even assuming the Commission could validly interfere with the Nation's community of interest in order to accommodate the Tribe, the Commission nevertheless violated Section 1(14)(D) because it was "practicable" to place the Tribe into district 2 without also splitting the Nation by placing 42 of its members into that district.[28] According to the Nation, the Commission erred by failing to accept one of the Nation's proposed alternatives that used

---

28. In its reply brief, the Nation asserts that the Commission and AFLR confessed this error by failing to address the argument. We think the latter parties sufficiently addressed this argument, albeit in the context of the contiguity goal.

*See infra* ¶¶ 102–07. Regardless, we are not required to accept a confession of error, and we decline to do so here. *O'Brien v. Escher*, 204 Ariz. 459, 462, ¶ 8, 65 P.3d 107, 110 (App.2003).

highways or other routes as connectors. We disagree.

¶ 101 The Tribe clearly has insufficient population, approximately 7000 members, to constitute a single congressional district. Therefore, the Commission reasonably connected the Nation-land-locked Tribe to district 2 via a narrow corridor. The Commission was required to "use visible geographic features, city, town and county boundaries, and undivided census tracts," to the extent practicable, to construct district lines. Ariz. Const. art. 4, pt. 2, § 1(14)(E). The Commission fulfilled that goal by constructing a narrow corridor that followed the Colorado River through the Grand Canyon. By selecting a corridor that transverses a sparsely populated area of the Nation reservation, the Commission also respected the Nation's interests to the extent practicable by placing only 42 [29] of its 104,000 residents into district 2. Although other corridors less intrusive of the Nation's interests might have been possible, the corridor selected by the Commission had a reasonable basis and the manner of selection was not clearly unconstitutional. *Murphy,* 117 Ariz. at 61, 570 P.2d at 1074; *Wilkins v. West,* 264 Va. 447, 571 S.E.2d 100, 108 (2002) ("[I]f the validity of the legislature's reconciliation of various criteria is fairly debatable and not clearly erroneous, arbitrary, or wholly unwarranted," the court must uphold the district lines.). Consequently, we will not second-guess the Commission's determination to balance the Section 1(14) goals by choosing a corridor that slightly divided the Nation's community of interests.

**B. Geographic compactness and contiguity—Section 1(14)(C)**

¶ 102 Article 4, Part 2, Section 1(14)(C) requires the Commission to create district boundaries that are "geographically compact and contiguous to the extent practicable." The Nation argues that the Commission violated this provision because carving out the Tribe from the Nation rendered district 2 non-compact and non-contiguous. The Commission and AFLR acknowledge that both

districts are less compact and contiguous than other districts, but contend that the Commission acted within its discretion and in order to respect the Tribe's community of interest.

¶ 103 The goals of compactness and contiguity concern the shape of a district. *Carstens,* 543 F.Supp. at 87. "Compactness" refers to length of the district's borders. *Id.* The shorter the distance around the district, the more compact the district. *Id.* "Contiguity" refers to the geographic connection uniting the entirety of a district. *Id.* at 88. A district that is geographically separated is not contiguous. *Id.* The purpose of constructing districts that are compact and contiguous is to avoid the practice of gerrymandering and "assist in maintaining communities of interest." *Symington,* 828 F.Supp. at 688.

¶ 104 The Nation asserts that the Commission discarded the compactness and contiguity goals set forth in Section 1(14)(C) in order to accommodate the political wishes of the Tribe, which cannot be considered under Section 1(14). But, as the Commission and AFLR point out, the Commission was only required to make district 2 compact and contiguous "to the extent practicable" and after striking a balance with the other goals set forth in Section 1(14). For the reasons previously explained, *see supra* ¶¶ 93–101, the Commission reasonably placed the Tribe into district 2 to respect the Tribe's community of interest. We therefore reject the Nation's contention that the Commission could not validly sacrifice a measure of compactness and contiguity in order to accommodate the Tribe's interests.

¶ 105 The Nation additionally asserts that district 2 is not contiguous because "[i]t is not reasonably possible to travel from the main body of District 2 to [the Tribe] without leaving the District." Thus, the Nation argues that use of the corridor to connect the Tribe to the rest of district 2 destroyed the district's contiguity in violation of Section 1(14)(C). We disagree.

29. At the time the Commission drew the congressional redistricting map, the census data reflected that only ten people of unknown affiliation resided in the area.

¶ 106 First, we do not agree that district 2 lacks contiguity merely because travel is difficult through the corridor linking the Tribe with the remainder of district 2. Section 1(14)(C) sets forth a goal of geographic contiguity, not geographic accessibility. We agree with the Virginia Supreme Court in *Wilkins*, which rejected a similar argument and reasoned that in the modern era of mass media and technology, which enables easy communication among district residents and their representative, "resting the constitutional test of contiguity solely on physical access within the district imposes an artificial requirement [that] reflects neither the actual need of the residents ... nor the panoply of factors which must be considered by the [redistricting body] in the design of a district." 571 S.E.2d at 109. The corridor tracks the Colorado River through the Grand Canyon and geographically connects the Tribe with the remaining portion of district 2. Thus, district 2 is geographically contiguous.

¶ 107 Second, as repeatedly explained, the Commission was only required to make the district geographically contiguous "to the extent practicable" after balancing the other goals set forth in Section 1(14). We will not second-guess the balance struck as long as the Commission had a reasonable basis for its decision, which exists in this case.

### C. Use of undivided census tracts—Section 1(14)(E)

¶ 108 Article 4, Part 2, Section 1(14)(E) provides that "[t]o the extent practicable, district lines shall use ... undivided census tracts." The Nation argues that the Commission violated this section by dividing census tract 9445 to accommodate a goal not set forth in Section 1(14): the Tribe's political wish to be in a separate district from the Nation. This argument mirrors the Nation's contentions concerning subsections 1(14)(C) and (D), which we have already rejected. *See supra* ¶¶ 93–107. For the same reasons, we reject the Nation's challenge under Section 1(14)(E). The Commission validly compromised the census-tract goal in order to accommodate the Tribe's community of interest.

¶ 109 For all these reasons, we hold that the trial court properly entered summary judgment in favor of the Commission, AFLR, and the Tribe on the Nation's complaint.

### IV. Summary of holdings

¶ 110 In deciding whether the Commission violated the Equal Protection Clause, the trial court was required to apply the less-deferential strict scrutiny standard of review only if the legislative and congressional redistricting plans substantially burdened fundamental rights or made distinctions based on a suspect class. Otherwise, the court was required to use the more-deferential rational basis standard of review to evaluate equal protection challenges to the plans. The right to vote in elections is a fundamental right. However, the Commission's placement of voters into various legislative and congressional districts after applying specific constitutional criteria did not substantially burden this right. The record further fails to reflect that the Commission singled out and discriminated against a suspect class. Consequently, use of the strict scrutiny standard to evaluate the equal protection claims was unwarranted, and the trial court erred by applying that standard. *See supra* ¶¶ 18–37.

¶ 111 The terms used in Article 4, Part 2, Section 1(14) of the Arizona Constitution, which direct the redistricting process, are self-executing. Therefore, the Commission did not violate equal protection principles by failing to adopt definitions for those terms before utilizing them, and the trial court erred by ruling otherwise. *See supra* ¶¶ 39–49.

¶ 112 Although Commissioners do not have unfettered discretion in performing their redistricting duties, they are not required to ignore their personal knowledge and experiences in order to ensure compliance with the Equal Protection Clause. *See supra* ¶ 90.

¶ 113 Pursuant to Article 4, Part 2, Section 1(14)(F) of the Arizona Constitution, the Commission is required to consider competitiveness in establishing legislative and congressional districts. However, this competitiveness goal is subordinate to other goals

listed in Section 1(14)(B)—(E), and the trial court erred by entering a contrary ruling. If drawing competitive or more competitive districts would not be practicable or would cause significant detriment to the goals listed in subsections (B)—(E), the Commission must refrain from establishing such districts. Conversely, if it would be practicable to draw competitive or more competitive districts and to do so would not cause significant detriment to the goals listed in subsections (B)—(E), the Commission must establish such districts. *See supra* ¶¶ 50–61.

¶ 114 Article 4, Part 2, Section 1(15) of the Arizona Constitution provides that "the places of residence of incumbents or candidates shall not be identified or considered" in the mapping process. The provision does not prohibit the Commission from knowing this information or providing it to the Department of Justice at the latter's request. Rather, the Commission is prohibited from using such knowledge in establishing district boundaries. *See supra* ¶¶ 62–75.

¶ 115 In a prior opinion, this court held that communications between the Commission and its consultants are protected from disclosure by the legislative privilege. However, we additionally concluded that by designating consulting experts as testifying experts, the Commission waived any legislative privilege attaching to communications with those experts, or any materials reviewed by them, that relate to the subject of the experts' testimony. We now clarify that if the Commission redesignates a consultant as a fact witness rather than a testifying expert witness before that witness offers expert testimony, has not voluntarily produced privileged documents, and refrains from eliciting expert testimony from that consultant, the legislative privilege remains intact. *See supra* ¶¶ 76–89.

¶ 116 Article 4, Part 2, Section 1(14)(D) requires the Commission to create district boundaries that "respect communities of interest to the extent practicable." This provision permitted the Commission to respect the Hopi Tribe's community of interest by placing it into a congressional district separate from one containing the Navajo Nation, a dominant community of interest with competing political interests, even though some Nation members were separated from the remaining members. Additionally, the Commission did not violate this provision by balancing the interests of the Tribe and the Nation in a manner that slightly divided the Nation's community of interest. The trial court properly rejected the Nation's arguments concerning this provision. *See supra* ¶¶ 93–101.

¶ 117 Article 4, Part 2, Section 1(14)(C) requires the Commission to create district boundaries that are "geographically compact and contiguous to the extent practicable." The Commission did not violate this provision by placing the Tribe and Nation into separate congressional districts, even though the separation caused the district including the Tribe to become less compact and contiguous. The Commission reasonably sacrificed a measure of compactness and contiguity in striking a balance with the goal of respecting the Tribe's community of interest. Further, the Commission did not violate subsection (C) by connecting the Nation-land-locked Tribe to other parts of the Tribe's district via a narrow, non-traversable corridor. Subsection (C) sets forth a goal of geographic contiguity, not geographic accessibility. The trial court properly rejected the Nation's arguments concerning this provision. *See supra* ¶¶ 102–07.

¶ 118 Article 4, Part 2, Section 1(14)(E) states that "[t]o the extent practicable, district lines shall use ... undivided census tracts." The Commission did not violate this provision by dividing a census tract in order to place the Tribe in a congressional district separate from the majority of Nation members. The Commission validly compromised the census-tract goal to accommodate the Tribe's community of interest. The trial court properly rejected the Nation's arguments concerning this section. *See supra* ¶ 108.

¶ 119 Although the trial court erroneously used the strict scrutiny standard to decide the Nation's equal protection challenges to the congressional redistricting plan, the court correctly entered summary judgment against the Nation. *See supra* ¶¶ 92, 109.

## CONCLUSION

¶ 120 The trial court erred by applying the strict scrutiny standard of review to decide the equal protection challenges to the legislative redistricting plan. For this reason, we reverse that portion of the judgment entered by the court on January 16, 2004, that invalidated the legislative redistricting plan and ordered the Commission to take additional action in constructing a new plan. We remand with instructions that the trial court apply the rational basis standard of review to resolve these challenges. We additionally instruct the court to decide whether the Commission violated the Equal Protection Clause and/or Article 4, Part 2, Sections 1(14) and (15) of the Arizona Constitution, after considering our interpretation of those provisions.

¶ 121 On remand, the trial court, in its discretion and after consulting with the parties, can determine whether and to what extent a new trial is warranted, or whether selected submission of additional evidence and/or argument is appropriate.

¶ 122 In light of our holding that the trial court erred in the portion of the January 16, 2004 judgment concerning the legislative redistricting plan, we also vacate the court's judgment entered on April 12, 2004 approving a new legislative redistricting plan. The arguments on appeal concerning the propriety of that plan are therefore rendered moot, and we do not address them.

¶ 123 The trial court properly entered summary judgment against the Nation on its challenges to the congressional redistricting plan. We therefore affirm the portion of the January 16, 2004 judgment reflecting that ruling.

¶ 124 Because the Coalition is no longer the prevailing party on its challenges to the legislative redistricting plan, we vacate the trial court's award of attorneys' fees in favor of the Coalition. We additionally deny its request for an award of attorneys' fees on appeal.

¶ 125 Finally, we vacate this court's May 28, 2004 decision order, which had stayed the trial court's January 16, 2004, and April 12, 2004 judgments.

District 1

Navajo Reservation

A

C

Distance across river corridor at A = 168'
Distance from A to A' = 135.8 miles
Distance from B to B' = 62.7 miles
Distance across corridor at C = 140' *
 * This example is one of numerous points along
 the river where corridor is less than 200' wide.

# APPENDIX A